Philip C. TOBIN, Plaintiff,

v.

**UNIVERSITY OF MAINE SYSTEM, et al., Defendants.**

No. CIV. 98–237–B.

United States District Court, D. Maine.

July 1, 1999.

Philip Tobin, pro se, Ellsworth, ME, for Plaintiff.

Paul W. Chaiken, Rudman & Winchell, Bangor, ME, for Defendant.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff Philip C. Tobin ("Plaintiff"), proceeding pro se, claims that he was denied admission to the University of Maine School of Law based on his age. He has filed suit against the following Defendants: Chancellor of the University of Maine System Terrence MacTaggart ("MacTaggart"), Dean of the University of Maine School of Law Colleen Khoury ("Khoury"), and various members of the admissions committee, including Professor Delogu, Professor Cluchey, Professor Ward, and Assistant Dean Barbara Gauditz ("Admissions Committee"). Plaintiff asserts that Defendants, in various configurations, violated 42 U.S.C. § 1983 (Counts I, II, and III), committed intentional or reckless infliction of emotional distress (Count IV), breached an implied covenant of good faith and fair dealing (Count V), and violated the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101–07 (Count VI). Before the Court is Defendants' Motion to Dismiss Counts I, III, IV, and V for failure to state a claim. For the reasons discussed below, the Motion to Dismiss Counts I, III, IV, and V is GRANTED.

## I. BACKGROUND

Plaintiff's Third Amended Complaint contains only a few discernable factual averments.[1] In the spring of 1997, Plain-

---

1. Plaintiff filed his first Complaint on December 1, 1998, in which he named the University of Maine System, the University of Maine School of Law, and "The Unknown Members of the Law School Admissions Committee for the class of the year A.D.2000" as defendants. He amended the Complaint a first time on December 7, 1998, and filed a Second Amended Complaint on January 25, 1999. Plaintiff then filed two motions seeking to amend the Second Amended Complaint to clarify the identity of party defendants: he

tiff's application for admission to the University of Maine School of Law ("Law School") was denied. Plaintiff was 65 years old at the time he applied. He claims that he exceeded the Law School's minimum entrance requirements and that he was denied admission because of his age.

Three of Plaintiff's Counts assert violations of 42 U.S.C. § 1983 ("Section 1983"). He alleges that Khoury violated his substantive due process rights (Count I), that Defendants violated the Equal Protection Clause of the Fourteenth Amendment (Count II), and that the Admissions Committee violated his substantive due process rights (Count III). Plaintiff seeks "presumed and punitive damages" for these alleged Section 1983 violations in an amount to exceed $150,000.00.

Plaintiff also asserts that Khoury's decision constituted intentional or reckless infliction of emotional distress (Count IV) and seeks punitive damages in an amount no less than $150,000.00. In addition, he alleges that Defendants breached an implied covenant of good faith and fair dealing (Count V) and seeks punitive damages to exceed $150,000.00. Finally, Plaintiff asserts that Defendants violated the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101–07 (Count VI), and seeks both $12,500.00 in compensatory damages and no less than $150,000.00 in punitive damages.

Defendants have moved to dismiss Counts I, III, IV, and V on the basis that these Counts fail to state claims upon which relief may be granted.

## II. MOTION TO DISMISS

When confronted with a Motion to Dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6), the Court views all of Plaintiff's factual averments as true and indulges every reasonable inference in Plaintiff's favor. *See Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996). The Court may grant Defendants' Motion to Dismiss "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 52 (1st Cir.1990). The Court may consider a Rule 12(b)(6) motion to dismiss brought after a defendant has filed its answer if, as in this case, the defendant raises the failure to state a claim as an affirmative defense in its Answer. *See Gerakaris v. Champagne,* 913 F.Supp. 646, 650–51 (D.Mass.1996).

## III. DISCUSSION

■ In evaluating the four claims at issue, the Court is mindful that pro se pleadings generally are subject to generous construction. *See Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Simmons v. Dickhaut,* 804 F.2d 182, 183 (1st Cir.1986); *Fagone v. Fagone,* 648 F.Supp. 488, 489 n. 1 (D.Me.1986).

### A. Count I—Substantive Due Process Violation Grounded in Deprivation of a Property Interest

■ Substantive due process claims may proceed under one of two theories. Under the first, a plaintiff asserts that the state has deprived him of a liberty or property interest protected by the Due Process Clause, while under the second, a plaintiff alleges that the state has acted in a manner that "shocks the conscience," regardless of the existence of a liberty or property interest. *See Pittsley v. Warish,* 927 F.2d 3, 6 (1st Cir.1991). Plaintiff clarified in his Response to Defendants' Motion to Dismiss that Count I proceeds under the first theory and is directed solely at an alleged deprivation of a property interest.

proposed to substitute MacTaggart for the University of Maine System, Khoury for the University of Maine School of Law, and Cluchey, Delogu, Ward, and Gauditz for "The Unknown Members of the Law School Admissions Committee for the class of the year A.D.2000." These two motions were consolidated and granted on March 23, 1999, and Plaintiff's Third Amended Complaint was filed that same day.

■ In order to demonstrate the existence of a property interest, a plaintiff "must have more than an abstract need or desire for it ... [or] a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Property interests are derived from "existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

As Defendants correctly note, pursuit of an education is not a fundamental right or liberty for purposes of substantive due process. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35–37, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (noting that education is neither explicitly nor implicitly protected by the Constitution); *Black v. Sullivan,* 561 F.Supp. 1050, 1058 (D.Me. 1983) (observing that "[a] state-subsidized, post-secondary education is not a fundamental constitutional right" in course of evaluating constitutionality of University of Maine tuition classification rules). To the extent property interests have been identified in the realm of higher education, they generally have been assumed rather than found, and then only in cases involving matriculated, or at least admitted, students. For example, the Supreme Court has assumed that a student enrolled in a degree program has either a property interest, *see Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 223, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (holding that university's dismissal of student did not violate substantive due process), or a liberty interest in continued enrollment. *See Board of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 84–85, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (finding that medical school's dismissal of student did not violate substantive due process). Other courts have followed suit in making this assumption. *See Martin v. Helstad,* 699 F.2d 387, 390 (7th Cir.1983) (assuming existence of property interest where plaintiff was admitted to law school but then had admission revoked when school learned application failed to disclose felony conviction); *Amelunxen v. University of P.R.,* 637 F.Supp. 426, 430 (D.P.R.1986), *aff'd* 815 F.2d 691 (1st Cir.1987) ("[Defendants] may assume, as the Supreme Court has done, and we will do, that a student has either a property or liberty interest in continuing education.").

■ The Court is convinced that Plaintiff, who was neither accepted by nor enrolled at the Law School, can assert no more than a "unilateral expectation" of admission, as opposed to a "legitimate claim of entitlement" to it. That applicants for admission to professional or graduate school do not have a property interest in admission is well-established. *See Phelps v. Washburn Univ. of Topeka,* 632 F.Supp. 455, 459 (D.Kan.1986) ("it is well settled that a person does not have a property interest in admission to law school"); *Selman v. Harvard Med. Sch.,* 494 F.Supp. 603, 619 (S.D.N.Y.1980), *aff'd* 636 F.2d 1204 (2nd Cir.1980) (finding medical school transfer applicant had no property interest in admission); *Ramos v. Texas Tech Univ.,* 441 F.Supp. 1050, 1055 (N.D.Tex.1977), *aff'd* 566 F.2d 573 (5th Cir.1978) (holding graduate school applicant who never was accepted into program did not have property interest); *Szejner v. University of Alaska,* 944 P.2d 481, 486 (Alaska 1997) ("A person does not have a property interest in admission to graduate school."). Even some admitted students have been found to lack a property interest. *See Unger v. National Residents Matching Program,* 928 F.2d 1392, 1397 (3rd Cir.1991) (holding student accepted into university hospital residency program that was discontinued prior to her enrollment did not have property interest in pursuit and continuation of medical education).

Plaintiff attempts to circumvent this barrier to Count I by framing his claimed

property interest as an interest in a "benefit entitlement," as a Maine citizen, to a professional education at a reduced rate at a state school. In essence, he argues that by denying him admission to the Law School, Khoury deprived him of a property right in the form of an opportunity to go to law school at a reduced rate of tuition. The Court is convinced that adoption of this position would lead to absurd results, for the fact of reduced tuition rates for in-state residents certainly is no guarantee that any in-state resident who wishes to attend a state institution of higher education will be able to do so. Rather, the reduced tuition rates are a benefit enjoyed by in-state residents *who have been deemed qualified for admission and have been so admitted.*

Indeed, several courts have recognized that reduced tuition rates for in-state residents give rise to a property right, but each did so in the context of matriculated students who wished to change their status from nonresident to resident for tuition purposes. *See Lister v. Hoover,* 706 F.2d 796, 802 (7th Cir.1983) (noting University of Wisconsin students had property interest in "difference between resident and nonresident student tuition"); *Spielberg v. Board of Regents, Univ. of Michigan,* 601 F.Supp. 994, 997–98 (E.D.Mich.1985) (observing enrolled student had property interest in "difference between in-state and out-of-state tuition"); *Michelson v. Cox,* 476 F.Supp. 1315, 1321 (S.D.Iowa 1979) (noting University of Iowa student had property interest in "difference between the resident and nonresident tuition rate"). Any expectation Plaintiff had, however, in reduced tuition rates at the Law School was contingent upon his acceptance by the Law School. Logically, Plaintiff's property interest claim must fail because he never made it beyond the application stage.

In an effort to salvage Count I, Plaintiff seizes on a passage in *Perry v. Sinder-*

**2.** In that case, a non-tenured state junior college professor whose contract was not renewed brought First Amendment and proce-

*mann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), as support for the property interest he claims.[2] The passage is situated within a discussion of whether the plaintiff's lack of a contractual or tenure entitlement to reemployment was relevant to analysis of his First Amendment claim, *see Perry,* 408 U.S. at 597–98, 92 S.Ct. 2694, 33 L.Ed.2d 570, and reads as follows:

> [E]ven though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which (it) could not command directly." Such interference with constitutional rights is impermissible.
>
> We have applied this general principle to denials of tax exemptions, unemployment benefits, and welfare payments. But most often we have applied the principle to denials of public employment. We have applied the principle regardless of the public employee's contractual or other claim to a job.

*Id.* at 597, 92 S.Ct. 2694 (citations omitted).

This passage from *Perry* has absolutely no substantive, factual, or even contextual relationship to the question of whether an applicant for admission has a property interest in reduced tuition rates at a professional school run by the state in which he resides, and is therefore unpersuasive. Count I is dismissed.

dural due process claims against the college. *See Perry,* 408 U.S. at 595, 92 S.Ct. 2694.

## B. Count III—Substantive Due Process Violation Grounded in Deprivation of a Liberty Interest

■ In Count III, Plaintiff alleges that the Admissions Committee denied him a "right [to seek] gainful employment through education." (Pl.'s Third Am. Compl. at 2.) In his Response to Defendants' Motion to Dismiss, Plaintiff explains that he again is proceeding under the first substantive due process theory mentioned above, but that in this Count he is asserting a liberty interest in the right to pursue his occupation of choice. Defendants contend that their rejection of Plaintiff's application for admission does not implicate a liberty interest. The Court agrees.

Plaintiff is correct that "[liberty] denotes not merely freedom from bodily restraint but also the right of the individual ... to engage in any of the common occupations of life." *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Moreover, it is beyond doubt that a state "cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process ... Clause of the Fourteenth Amendment." *Schware v. Board of Bar Examiners of State of N.M.,* 353 U.S. 232, 238–39, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (holding that state's denial of law school graduate's application to take bar exam bar based on his prior use of aliases, former membership in Communist party, and arrest record violated due process). Yet, these broadly worded guarantees do not mean that Plaintiff has a liberty interest in admission to the University of Maine School of Law.

In the context of higher education, as in the area of public employment, the central inquiry for purposes of liberty interest analysis is whether the state's actions have effectively foreclosed a person's opportunity for education or employment in a particular area. *See Unger v. National Residents Matching Program,* 928 F.2d 1392, 1396 (3rd Cir.1991) (rejecting plaintiff's claimed liberty interest in pursuit and continuation of medical education in absence of allegations that university hospital "imposed upon her a stigma or other disability that generally foreclosed her freedom to take advantage of other educational opportunities"); *Greenhill v. Bailey,* 519 F.2d 5, 8 (8th Cir.1975) (medical school's dismissal of student implicated liberty interest because school denigrated student's intellectual capacities to parties outside of school community in course of dismissal); *Grove v. the Ohio State Univ., College of Veterinary Medicine,* 424 F.Supp. 377, 382–83 (S.D.Ohio 1976) (finding that veterinary school applicant had liberty interest because unrebutted facts indicated that denial of admission by one school assured denial of admission by all others).

Numerous courts have referenced this principle in holding that applicants for admission to graduate or professional school do not have a liberty interest. *See Phelps v. Washburn Univ. of Topeka,* 632 F.Supp. 455, 459 (D.Kan.1986) (holding denial of admission to law school does not implicate liberty interest unless school accused applicant of dishonesty or published reasons for its decision); *Selman v. Harvard Med. Sch.,* 494 F.Supp. 603, 619 (S.D.N.Y.1980), *aff'd* 636 F.2d 1204 (2nd Cir.1980) (finding medical school transfer applicant had no liberty interest because he did "not contend that defendant medical schools published any damaging information which hurt his chances for admission at other schools"); *Ramos v. Texas Tech Univ.,* 441 F.Supp. 1050, 1054 (N.D.Tex.1977), *aff'd* 566 F.2d 573 (5th Cir.1978) (holding denial of admission to graduate program does not implicate liberty interest in absence of stigmatizing conduct and other tangible injury); *Szejner v. University of Alaska,* 944 P.2d 481, 486 (Alaska 1997) (finding denial of admission to graduate school does not implicate liberty interest in absence of accusation of dishonesty or publication of reasons for decision).

In this case, the Court is persuaded that Plaintiff's allegations do not implicate a liberty interest. Plaintiff applied to the

Law School and was denied admission. He does not allege that any conduct on the part of the Law School affected any other applications he may have submitted, or intends to submit, to other law schools. Furthermore, he does not allege that he is foreclosed from pursuing a legal education and career.[3] While Plaintiff does allege that the denial of admission was age-based, that claim is governed by the Equal Protection Clause and serves as the basis for Count II of the Third Amended Complaint, which is not a subject of the Motion to Dismiss.[4] Count III is dismissed.

## C. Count IV—Intentional or Reckless Infliction of Emotional Distress

Plaintiff alleges that Khoury is liable for intentional or reckless infliction of emotional distress because her rejection of his application denied him "the opportunity of insuring his well-being and independence in his senior years through gainful employ-

ment predicated on a legal education ..." (Pl.'s Third Am. Compl. at 3.)

■ In Maine, tort actions against governmental actors, including employees of government entities, are governed by the Maine Tort Claims Act ("MTCA"), Me. Rev.Stat. Ann. tit. 14, §§ 8101–18. Defendants contend that Count IV is barred because Plaintiff failed to comply with the notice provisions of the MTCA. The Court agrees.

The MTCA requires that a claimant file notice of his tort claim with the governmental defendant within 180 days of the accrual of the cause of action. *See* Me. Rev.Stat. Ann. tit. 14, § 8107 (West 1980 & Supp.1998). Although the Third Amended Complaint does not shed any light on the sequence of events in this case, Plaintiff attached a number of illuminating documents to his Response to the Motion to Dismiss.[5] Both parties referred to the

---

3. Presumably, Plaintiff has not been prevented from applying to other law schools or from reapplying to the Law School.

4. To the extent one might argue that Plaintiff has a liberty interest in not being denied admission because of his age, the Court is unpersuaded. The Court is aware of only one case that arguably might support this proposition. In *Thomas v. Gee*, 850 F.Supp. 665 (S.D.Ohio 1994), it was held that a medical student has a liberty interest in not being dismissed from medical school because of her race. The *Thomas* Court found that the plaintiff's allegations that she was dismissed from medical school because of her race stated a claim under both equal protection and substantive due process theories. *See Thomas*, 850 F.Supp. at 676 ("This interest—the right to pursue her education free of racial discrimination—is a fundamental right not just implicitly protected by the Constitution but expressly protected by the equal protection clause."). The sole case on which the *Thomas* Court relied in reaching this conclusion was *Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir.1988), a public employment case involving the sex discrimination claim of a female professor at a state university who was denied tenure. The *Gutzwiller* Court was reviewing a jury verdict that found that the defendants had denied the professor both equal protection and substantive due process. *See Gutzwiller*, 860 F.2d at 1328. In upholding the

verdict, the Court found that the facts presented a scenario where a violation of the Equal Protection Clause also constituted a violation of substantive due process. *See id.* at 1329 ("[F]or a tenure decision at a public university to be made on the basis of an individual's sex not only constitutes the kind of invidious discrimination prohibited by the equal protection clause but also constitutes an arbitrary and capricious deprivation of the individual's liberty interest in not being terminated from governmental employment for a constitutionally impermissible purpose.").

Aside from the fact that *Thomas* involved an enrolled student and not an applicant, the case at bar can be distinguished from *Thomas* on a number of other bases, including the fact that race and age are not similarly situated categories for purposes of constitutional analysis. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312–13, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). Most importantly, however, this Court is concerned that the *Gutzwiller/Thomas* approach may conflate the question of what due process protections are required with the question of whether the Due Process Clause is implicated at all. It therefore declines to press such an inquiry here.

5. The documents include: a copy of a letter from the United States Department of Education's Office of Civil Rights to Plaintiff, a copy of a notice of claim letter submitted by

dates mentioned in these documents in their arguments on the Motion to Dismiss. Because the Court cannot resolve this issue without consideration of these matters outside of the pleadings, the Court converts the Motion to Dismiss into a Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 12(c), as to Count IV only.[6]

The evidence reveals the following. On March 26, 1997, Plaintiff was informed that he had been denied admission to the Law School. He filed an age discrimination complaint with the United States Department of Education's Office of Civil Rights ("OCR") on August 20, 1997. On February 20, 1998, the OCR concluded that Plaintiff's Age Discrimination Act of 1975 claim was not meritorious. Plaintiff filed an MTCA notice of claim with the Attorney General and the Law School on July 7 and July 8, 1998, respectively, asserting tortious infliction of emotional distress.[7]

■ While Maine law has not explored the issue of when a cause of action accrues for purposes of the MTCA notice requirements, the Court concludes that Plaintiff's cause of action accrued on March 26, 1997, the date he learned that he had been rejected by the Law School.[8] His filing of a notice of claim well over a year after this

date is fatal unless he demonstrates "good cause" for the delay. *See* Me.Rev.Stat. Ann. tit. 14, § 8107 (West 1980 & Supp. 1998). The Maine Law Court has interpreted this "good cause" exception to apply only where a plaintiff was for some reason actually unable to file the required notice, or was prevented from learning of the information giving rise to the claim. *See Smith v. Voisine*, 650 A.2d 1350, 1352 (Me.1994). Plaintiff makes no such allegations. Rather, he seems to argue that the pendency of his age discrimination claim with the OCR tolled the 180–day clock. This contention is flawed.

■ Even assuming the MTCA contemplates that its notice requirements will be tolled pending the administrative resolution of tort claims, the documents submitted by Plaintiff reveal that the only claim before the OCR was a claim that Defendants had violated the Age Discrimination Act of 1975. Plaintiff's decision to file for administrative relief on a separate, non-tort claim has no effect on his obligation to comply with the MTCA's provisions with respect to his asserted tort claims. His failure to file a notice of claim within 180 days of the day he learned of his rejection cannot be excused,[9] and therefore Count IV is dismissed.[10]

Plaintiff to the Law School and to the Attorney General, and copies of the registered mail receipts related to Plaintiff's notice of claim letter.

**6.** The Court is aware of Defendants' request that such a conversion not occur without an opportunity for them to provide their own evidence. (Defs.' Reply Pl.'s Resp. Mot. Dismiss at 1 n. 1.) Since Defendants do not contest the accuracy of the information in Plaintiff's documents, however, and since they in fact adopt the dates mentioned therein in their arguments, the Court does not consider it prudent to delay resolution of this issue by inviting further evidentiary submissions. *See Chaparro–Febus v. International Longshoremen Ass'n. Local 1575*, 983 F.2d 325, 332 (1st Cir.1992) (holding failure to notify counsel of conversion harmless "when the opponent has received the affidavit and materials, has had an opportunity to respond to

them, and has not controverted their accuracy").

**7.** Plaintiff also asserted two non-tort claims in this document.

**8.** The Court observes that in the context of the Federal Tort Claims Act, a cause of action accrues at the time of the plaintiff's injury. *See Attallah v. United States*, 955 F.2d 776, 779 (1st Cir.1992).

**9.** In addition, Plaintiff cannot seek refuge in the "substantial compliance" exception to the MTCA notice requirements. This exception only applies where the notice of claim is defective in a manner other than timeliness. *See Kelly v. University of Maine*, 623 A.2d 169, 172 (Me.1993).

**10.** Because the Court has determined that Plaintiff failed to comply with the MTCA notice provisions, it need not reach Plaintiff's

## D. Count V—Breach of an Implied Covenant of Good Faith and Fair Dealing

In Count V, Plaintiff alleges that Defendants breached an implied duty of good faith and fair dealing. He asserts that Defendants had a duty to evaluate his application fairly, and that they violated that obligation by rejecting him because of his age. Defendants argue that Plaintiff has set forth no legal or factual basis entitling him to relief.

Plaintiff contends that a contract arose between himself and the Law School when (i) the Law School "offered" to consider his application, (ii) he "accepted" that offer by submitting an application, and (iii) he paid "consideration" in the form of an application fee.[11] Defendants acknowledge that contracts may be formed between students and universities. *See Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir.1998) ("The terms of the contract may include statements provided in student manuals and registration materials."). Although they suggest that the relationship between an applicant and a university should be distinguished from the relationship between a student and a university, Defendants do not pursue the theory that no contract existed between the parties in this case. Rather, they argue that even assuming the existence of a contract that implied a duty of good faith and fair dealing in the evaluation of Plaintiff's application,[12] Plaintiff's averments do not come close to supporting a finding of breach. The Court agrees.

In *Mangla v. Brown Univ.*, 135 F.3d 80 (1st Cir.1998), the First Circuit considered whether the defendant had breached an implied duty of good faith and fair dealing recognized by Rhode Island law when it rejected a probationary student's application for admission to one of its graduate programs. The Court affirmed the trial court's conclusion that there was no evidence that the defendant had acted arbitrarily or in bad faith. *See Mangla*, 135 F.3d at 84. In so finding, the Court observed the following:

> The decision to grant or deny admission to a student is a quintessential matter of academic judgment. Courts have long recognized that matters of academic judgment are generally better left to the educational institutions than to the judiciary and have accorded great deference where such matters are at issue. As the Supreme Court stated in Regents of University of Michigan v. Ewing, 'Plainly, [judges] may not override [the faculty's professional judgment] unless it is such a substantial departure from accepted academic norms as to

additional Count IV arguments concerning sovereign immunity.

**11.** At least one court has embraced such a scenario as contract-forming, though it framed the offer-acceptance relationship differently. In *Steinberg v. Chicago Med. Sch.*, 69 Ill.2d 320, 13 Ill.Dec. 699, 371 N.E.2d 634 (1977), the Illinois Supreme Court was confronted with a similar fact pattern and held:

> Here the description in the brochure containing the terms under which an application will be appraised constituted an invitation for an offer. The tender of the application, as well as the payment of the fee pursuant to the terms of the brochure, was an offer to apply. Acceptance of the application and fee constituted acceptance of an offer to apply under the criteria defendant has established.

> ... The application fee was sufficient consideration to support the agreement between the applicant and the school.

*Steinberg*, 13 Ill.Dec. 699, 371 N.E.2d at 639.

**12.** Defendants correctly note that, thus far, the Maine Law Court has recognized an implied covenant of *objective* good faith (otherwise known as a "commercial reasonableness" standard) only in limited situations governed by the Uniform Commercial Code. *See Niedojadlo v. Central Maine Moving & Storage Co.*, 715 A.2d 934, 936–37 (Me.1998). The Law Court has implied a covenant of good faith and fair dealing in the relationship between insurers and insureds, *see Niedojadlo*, 715 A.2d at 937 n. 3, but has not had the occasion to decide whether the interactions between applicants and universities give rise to contracts containing an implied duty of good faith and fair dealing.

demonstrate that the person or committee responsible did not actually exercise professional judgment.'

*Mangla,* 135 F.3d at 84 (citations omitted).

In his Response to the Motion to Dismiss, Plaintiff alleges that the Law School: (i) only considered his 2.79 college grade point average, which dates back to 1959, rather than the 3.6 grade point average he achieved in a Legal Technology program in 1997 and the life experiences he has had since 1959, and (ii) admitted another applicant from the same application pool who had a college grade point average of 2.2. The Court cannot imagine a decision more appropriately left to "academic judgment" than the decision as to which grade point average should be considered for purposes of evaluating an application to a degree program. As for Plaintiff's remaining contention, the mere allegation that the Law School admitted a candidate whose grade point average fell below his cannot serve as the basis for a cause of action premised on bad faith and "substantial departure from accepted academic norms." Consequently, Count V is dismissed.

## IV. CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss Counts I, III, IV, and V is GRANTED.

*SO ORDERED.*